IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| JENNIFER ADKINS, <br><br> Plaintiff. <br><br> v. <br><br> COVENTRY HEALTH CARE, et al., <br><br> Defendants. | Civil Action Number 3:04CV825-JRS |

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendants Coventry Health Care, Inc.'s ("CHC") and Southern Health Services, Inc.'s ("SHS") (collectively "Defendants") Motion for Summary Judgment, filed on April 27, 2005. For the reasons stated below, Defendants' motion is GRANTED.

**I. BACKGROUND**

CHC is a Delaware corporation, which owns and controls 13 different health care plans. CHC is the parent company of SHS. Plaintiff Jennifer Adkins was hired as the SHS Vice President of Health Services on June 2, 1997, pursuant to a signed letter of employment. On February 19, 1999, Plaintiff received a 4.06 performance evaluation,[1] indicating that she was performing "substantially beyond the requirements for performing the job." See 1999 Eval. at TS000006-08. In the evaluation area entitled "Ability to work well with others; Uses good communication and interpersonal skills; Projects a positive attitude," Plaintiff received a 3.5 rating and the following comments:

---

[1] The rating system is based on a 1 to 5 scale, with five representing exceptional performance.

> Jennifer demonstrates strong verbal and written communication skills. She works well with her staff and members of other departments to achieve the overall objectives. She will confront an issue head on to achieve resolution. She is extremely direct in her presentation. As a result this is sometimes perceived as abrupt. She continues to refine presentation skills necessary to foster team work.

<u>See</u> 1999 Eval. at TS000006. Plaintiff was subsequently promoted to Vice President of Operations. On August 8, 2000, Plaintiff received another positive performance review indicating that she "displays excellent management skills and possesses [an] outstanding work ethic and job knowledge." Plaintiff was promoted to the position of Executive Director[2] ("ED") later that month.

In September 2001, CHC acquired a health plan called QualChoice of Virginia ("QualChoice"), and merged it with SHS. In connection with this acquisition, Plaintiff was promoted to the newly created position of Chief Operating Officer of Southern Health ("COO"). SHS hired Cosby Davis as permanent CEO on January 2, 2002. As part of the merger, Plaintiff was required to terminate the QualChoice nurse intake staff in Charlottesville and consolidate the Charlottesville intake and preauthorization operations into the Richmond Office. As a result of the termination, a flood of telephone calls were directed to the Richmond staff which resulted in a long wait time for callers, and required a one month reassignment of sales personnel to assist with fielding the calls.

In April 2002, Plaintiff received a "360 Degree Feedback" review which encompassed comments and criticism from 19 of her peers. No score was below 3.5 in any overall competency category, and only two or three individual scores were below 3.5. Some of the comments Plaintiff received as feedback were:

Needs Improvement: Collaboration;

Improvement area- get the management team (entire team) involved;

---

[2]This is the company's previous name for the Chief Executive Officer position.

> In terms of improvement, there has been incidence of decisions made too quickly without taking into account the entire impact. Improvement could be obtained by incorporating the thoughts of others within the organization so as to fully understand the impact that certain decisions [may] bring;
>
> Areas of Improvement- increase positive feedback and compliments as goals etc are met, increase visibility and rapport with the line staff.

See 360 Degree Feedback Eval.

On August 7, 2002, Mr. Davis evaluated Plaintiff's work performance and gave her an overall score of "Successful." Mr. Davis noted that, "Jenn can be counted on to perform in an effective and efficient manner....[but] needs to focus on her leadership skills to become a positive proactive leader on the senior management team." See 2002 Competency Assessment Form. Mr. Davis evaluated Plaintiff's ability to develop strategies to influence others towards the accomplishment of business goals and her ability to encourage the input of people affected by decisions as "Learning," the lowest ranking category. Id.

Throughout Plaintiff's tenure at SHS, annual meetings for senior management were held. After these meetings, attendees were invited to participate in a variety of voluntary recreational activities including golf, tennis, sight seeing, spa visits, and shopping. Plaintiff asserts that the golf outings were predominated by men, and females, especially Plaintiff, were made to feel unwelcome at the after hours drinking and cigar smoking get-togethers.

In March 2003, Eileen Walter, a part-time executive at SHS, filed a complaint against Plaintiff, alleging that Plaintiff committed legal and ethical improprieties in SHS's operations and criticized Plaintiff's management as COO. Plaintiff was cleared of any wrongdoing by SHS's legal department. Prior to the complaint, Plaintiff placed Ms. Walter on a list of employees to be terminated pursuant to a reduction in force ("RIF"). Plaintiff asserts that Ms. Walter learned of her

inclusion in the RIF prior to receiving formal notification and prior to filing her complaint about Plaintiff.

In July of 2003, Plaintiff, Mr. Davis, and Bill O'Donnell, a SHS sales executive, had a meeting where they discussed operational issues. Mr. Davis remained relatively silent during the meeting. After the meeting, Plaintiff asked Mr. Davis why he did not support her more strongly during the session. Mr. Davis allegedly replied that there was no need because Plaintiff could "handled herself as well as any man" in such discussions.[3] Plaintiff was ready to terminate Mr. Donnell's employment over operational matters, but Mr. Davis was not ready, so he offered Mr. O'Donnell a chance to develop a network strategic plan. A subsequent review of the plan revealed that it was subpar, and Mr. O'Donnell was ultimately terminated by Mr. Davis. On July 25, 2003, Mr. O'Donnell sent an e-mail complaint against Plaintiff to James McGarry, CHC's Senior Vice President, citing allegations similar to those alleged by Ms. Walter. However, the issues raised by Mr. O'Donnell were deemed invalid and his termination stood.

After the filing of the Walter and O'Donnell complaints, Mr. McGarry and Mr. Davis reviewed the senior management team at SHS in an effort to strengthen the management team and improve operations at SHS. As a result of the review, Mr. McGarry and Mr. Davis decided to eliminate the COO position in order to improve and "flatten" the organizational structure and management of SHS, which they believed was suffering because of Plaintiff's poor management and lack of leadership. On September 24, 2003, Mr. Davis informed Plaintiff that the position of COO was being eliminated. Plaintiff alleges that Mr. Davis told her:

---

[3] Mr. Davis denies making any such statement.

> Jenn, we have to discuss something that is very difficult for me. The company's official position is that we will no longer have a COO in the health plan. As a result, we are eliminating your position effective today. I can't leave it at that explanation. I will tell you the reason and if you repeat it to anyone I will deny I ever said it. Coventry wants you gone. I have been dealing with this issue for the last three weeks. I go back to Jim to inform him I want you to stay I was told that was the incorrect decision and to reevaluate my decision.

There are no documented complaints prior to Plaintiff's termination from her superiors regarding her management style. Defendants have a "corrective action" process that managers are supposed to follow regarding employee counseling and discipline. The procedures require that all corrective actions be in writing. Defendant asserts that this progressive discipline is not followed with respect to senior managers.

On November 8, 2004, Plaintiff filed a Complaint against Defendants in federal district court. Plaintiff subsequently submitted a three count amended Complaint on November 12, 2004. Count One of Plaintiff's Complaint alleges sex discrimination, in violation of Title VII of the Civil Rights Act of 1964. Specifically, Plaintiff asserts that she was sexually discriminated against because she was a strong, forthright female in the male-dominated culture of senior management at SHS and CHC. Count Two seeks recovery under a theory of *quantum meruit* and breach of contract. Count Three alleges breach of contract. On February 1, 2005, the Court dismissed Count Three of Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted. Defendants filed the instant motion on April 27, 2005. Oral argument in this matter was held on May 27, 2005.

## II. STANDARD OF REVIEW

A motion for summary judgment lies only where "there is no genuine issue as to any material fact" and where the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

See also Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Haavistola v. Cmty. Fire Co. of Rising Sun, Inc., 6 F.3d 211, 214 (4th Cir. 1993); Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). The Court must view the facts and the inferences drawn therefrom in the light most favorable to the party opposing the motion. Ballinger v. North Carolina Agr. Extension Serv., 815 F.2d 1001, 1004 (4th Cir.), cert. denied, 484 U.S. 897 (1987). While viewing the facts in such a manner, courts look to the affidavits or other specific facts to determine whether a triable issue exists. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). According to the Fourth Circuit:

> In determining whether summary judgment may be granted, the district court must perform a dual inquiry into the *genuineness* and *materiality* of any purported factual issues. Whether an issue is genuine calls for an examination of the entire record then before the court in the form of pleadings, depositions, answers to interrogatories, admissions on file and affidavits, under Rule 56(c) and (e) . . . . Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes.

Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985) (emphasis in original). Summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In employment discrimination cases, "[a]n employer is entitled to summary judgment if the plaintiff fails to establish a *prima facie* case of discrimination or fails to raise a factual dispute regarding the employer's proffered reason for the alleged discriminatory act." Henson v. Liggett Group, Inc., 61 F.3d 270, 274 (4th Cir. 1995) (citations omitted). A plaintiff's subjective opinion that she was the victim of discrimination, without more, is insufficient to establish a *prima facie* case for discrimination to survive a motion for summary judgment. Henderson v. Anne Arundel Cty. Bd. of

Educ., 54 F. Supp.2d 482, 484 (D. Md. 1999) (citing Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988)).

### III. DISCUSSION

**A. Count One**

    1. McDonnell Douglas Analysis

Plaintiff alleges that she was terminated by Defendants due to gender discrimination, in violation of Title VII. For claims of disparate treatment under Title VII, the plaintiff has the initial burden of proving a *prima facie* case of discrimination by showing that the defendant acted with discriminatory intent. Wileman v. Frank, 979 F.2d 30, 33 (4th Cir. 1992). Discriminatory intent may be shown by either direct evidence or through circumstantial evidence which raises an inference of discriminatory intent. Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir. 1998).

In order to survive summary judgment, Plaintiff must satisfy the four-prong indirect proof scheme established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Accordingly, in order to make a *prima facie* case for gender discrimination, Plaintiff must show that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) at the time of the adverse employment action she was performing at a level that met her employer's legitimate job expectations; and (4) the position remained open or was filled by similarly qualified applicants outside the protected class. See Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315 (4th Cir. 1993); see also McDonnell Douglas, 411 U.S. at 802; Williams v. Cerberonics, Inc., 871 F.2d 452, 455 (4th Cir. 1989). Only elements three and four are at issue in this case.

If Plaintiff satisfies her initial burden of production by establishing a *prima facie* case, a presumption of unlawful discrimination arises and the burden of production shifts to Defendants to

7

articulate a legitimate, non-discriminatory reason for the adverse employment decision. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993) (citing Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)). If Defendants "articulat[e] a legitimate, non-discriminatory explanation which, if believed by the trier of fact would support the conclusion that discrimination was not a determinating factor in the adverse employment decision, the presumption created by the *prima facie* case 'drops from the case,' and [P]laintiff bears the ultimate burden of proving that [Defendants] intentionally discriminated against [her]." Mitchell, 12 F.3d at 1315 (citing Hicks, 509 U.S. at 507). Specifically, Plaintiff must show that the non-discriminatory reason proffered by Defendants was a pretext to mask unlawful discrimination. Hicks, 509 U.S. at 507-018.

*a. Element Three: Plaintiff's Performance Level*

Plaintiff contends that she can establish that her performance was satisfactory at the time of her job reassignment by showing that she had been promoted, received pay increases, and generally received positive job reviews. See Bass v. E.I. Dupont de Nemours & Co., 324 F.3d 761, 766, n.1 (4th Cir. 2003). Plaintiff relies in part on the situation in Rowland v. American General Finance, Inc., 340 F.3d 187, 109 (4th Cir. 2003), in which a female plaintiff brought a sexual discrimination case against her employer because she was repeatedly passed over for promotions. Id. at 189. In reviewing the facts of the case, the Fourth Circuit noted that:

> Indisputably, [the plaintiff's] performance reviews revealed sufficient qualification for promotion to the district manager position. Indeed throughout her employment with American General, [plaintiff] received "favorable annual performance reviews" and annual merit-based pay increases. Her supervisors generally found that her job performance exceeded standards, and that she comported herself with a high-level of professionalism. At the same time, however, [plaintiff's] annual reviews from 1995 and 1996 suggested that she needed to work on her "people skills"...[and] [plaintiff] received a copy of a written complaint that a customer, who was apparently dissatisfied with the way [plaintiff] had handled his attempt to cancel a loan, had

> filed a complaint with the State Corporation Commission....[Plaintiff] learned that several employees, and former mangers felt that [she] had problems with her people skills...[and that she] sometimes alienated those who worked with her.

Id. at 190. The Fourth Circuit found that the district court abused its discretion by refusing to give a mixed motive instruction to the jury. Id. at 193. Plaintiff asserts that similar to Rowland, she has had a successful rise to COO of SHS and has a history of consistently strong job reviews, bonuses, and pay raises during her tenure in that position.[4]

Plaintiff further contends that Defendants' complaints about her management style are irrelevant to whether she has established a *prima facie* case given the evidence of her satisfactory job performance. Plaintiff suggests that this information is part of Defendants' burden of production in response to Plaintiff's *prima facie* case.

Plaintiff has failed to establish a *prima facie* case for discrimination because she cannot establish that she was performing at a level that met her employer's legitimate job expectations. See Mitchell, 12 F.3d at 1315. Although Plaintiff's evaluations were generally positive, many of her evaluations contained references regarding her poor leadership and management skills. Favorable remarks in one aspect of a job do not automatically mean that Plaintiff was meeting her employer's legitimate job expectations as a whole. Accordingly, Plaintiff cannot establish element three of her *prima facie* case.

---

[4] Plaintiff's reliance on Rowland is misplaced. The Rowland court's discussion regarding the plaintiff's lack of "people skills" and her job qualifications were factors considered when determining whether the plaintiff had presented enough evidence to elicit a mixed motive jury instruction; they were not used to determine whether the plaintiff was meeting her employer's legitimate job expectations under the McDonnell Douglas test. See Hill, 354 F.3d at 284-85 (instructing that plaintiffs may establish claims for intentional discrimination through two distinct avenues of proof– the pretext framework and the mixed motive framework).

*b. Element Four: Position Was Filled by Someone Outside the Protected Class*

Plaintiff asserts that the evidence shows that her job responsibilities were given to men. Plaintiff notes that her responsibilities were split between Matt Melenski, Debra Pennington, and Karen Ferguson. However, Plaintiff submits that Drew Joyce now supervises operations, and the subordinates who reported to her on those issues now report to him.[5] Plaintiff asserts that the transfer of part of her responsibilities to Mr. Melenski and the transfer of the bulk of her supervisory duties to Mr. Joyce establish that she was "replaced" by a member outside her protected class.

Plaintiff further asserts that the elimination of the COO position does not defeat her *prima facie* case. See Plotke v. White, No. 02-3289, 2005 WL 984363, at *6 (10th Cir. Apr. 28, 2005) ("[T]he elimination of the position...does not necessarily eviscerate a plaintiff's claim that her discharge was...motivated [by discrimination]."). Accordingly, Plaintiff contends that the third prong of the McDonnell Douglas test has been satisfied because she has presented evidence that Defendants directly shifted her job responsibilities, in part, to a male and shunted most of her supervisory duties with respect to operations to another male.

Plaintiff cannot establish a *prima facie* case for discrimination because her job duties were partial fulfilled by someone within her protected class. See e.g. Myers v. Crestone Int'l LLC, No. 03-10695, 2005 U.S. App. LEXIS 765, at **5 (5th Cir. Jan. 14, 2005) (finding that a female plaintiff alleging sex discrimination could not establish that she was replaced by someone outside of the protected class where two individuals, one male and one female, replaced her). In the instant case, three executive officers assumed the duties formerly associated with Plaintiff's position. Ms.

---

[5]Mr. Joyce has testified that he has not assumed any of Plaintiff's job duties. See Joyce Dep. at 39.

Pennington assumed responsibility for the operational aspects of the business; Ms. Ferguson took over the responsibilities for functions relating to the provision of medical services; and Mr. Meleski, assumed some of Plaintiff's duties regarding network development. While there is contradictory evidence about whether Mr. Joyce assumed Plaintiff's supervisory duties, it is clear that some of her duties were assigned to Ms. Ferguson and Ms. Pennington, two members of the same protected class as Plaintiff.

Alternatively, Plaintiff contends that while proof of the fourth prong of the McDonnell Douglas test is ordinarily essential to a *prima facie* case, a claim may survive even if the plaintiff's position was not filled by someone outside the protected group. See e.g. Brown v. McLean, 159 F.3d 898 (4th Cir. 1998). In Brown, the Fourth Circuit noted that:

> In order to make out a prima facie case of discriminatory termination, a plaintiff must ordinarily show that the position ultimately was filled by someone not a member of the protected class...[S]ome courts have indicated that there may be exceptions to this rule in limited situations, such as...where the employer's hiring of another person within the protected class is calculated to disguise its act of discrimination toward the plaintiff.

Id. at 905 (internal citations omitted); see also Jones v. Western Geophysical Co., 669 F.2d 280, 284 (5th Cir. 1982) (quoting Hedrick v. Hercules, 658 F.2d 1088, 1093 n.4 (5th Cir. 1981)) ("[T]he *McDonnell* court did not intend to establish an exclusive *prima facie* evidence test for discrimination in employment but rather recognized the need for the modification of the prima facie test depending on the nature of the case.").

Plaintiff is correct that the McDonald Douglas test may allow flexibility under this element in certain limited cases; however, the facts of this case do not merit a more lenient assessment of this element. This conclusion is supported by the fact that Plaintiff has not offered any evidence that the

11

women who assumed part of her job responsibilities were hired to disguise discrimination. Since Plaintiff cannot show that she was replaced by someone outside the protected class, she cannot establish a *prima facie* case.

### c. Proffered Reason for Termination

Even assuming, *arguendo*, that Plaintiff could establish a *prima facie* case, she cannot establish that the proffered reason for her termination is a pretext. "[T]he burden remains on [Plaintiff] to demonstrate the reasons offered by the [employer] are a pretext for discrimination, or stated differently, that the [employer's] reason is unworthy of credence to the extent that it will permit the trier of fact to infer the ultimate fact of intentional discrimination." See Dugan v. Albemarle County Sch. Bd., 293 F.3d 716, 723 (4th Cir. 2002) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S 133, 147 (2000)).

Plaintiff submits that she has provided enough evidence of sexual discrimination to counter Defendants' proffered reason that her management style and operational problems were the reason she was terminated. First, Plaintiff asserts that her performance evaluations from 1997 to 2002 do not show any misgivings about her managerial style from senior management. To the contrary, Plaintiff submits that the reviews state that she was "successful" and could be "counted on to perform in an effective and efficient manner." Second, Plaintiff suggests that the two major documented complaints about her management style were from two subordinates, Ms. Walter and Mr. O'Donnell, both of whom made their complaints after learning that Plaintiff had marked them for termination. Plaintiff notes that she was cleared of wrongdoing in connection with these complaints.

Third, Plaintiff argues that Defendants' problems with her "management style" stem from her unfeminine direct and aggressive manner of setting high expectations and keeping people accountable for their failure to meet those expectations. Plaintiff states that this type of sexual stereotyping is protected under Title VII:

> As for the legal relevance of sex stereotyping, we are beyond the day when an employer could evaluate employees by assuming or insisting that they match the stereotype associated with their group, for "[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.

Price Waterhouse v. Hopkins, 490 U.S. 228, 251 (1989), superceded in part by statute as stated in Preston v. Virginia ex rel. New River Comty. Coll., 31 F.3d 203, 207 (1994). Plaintiff contends that Mr. Davis treated her differently than the men under his charge because of her unfeminine, direct manner. Specifically, Plaintiff notes how Mr. Davis stated that she could handle herself in an argument "as well as any man." Plaintiff further maintains that Mr. Davis told her that her termination had nothing to do with the elimination of the COO position, but was because certain members of the senior management wanted her gone.

Fourth, Plaintiff argues that Defendants have constructed inconsistent, post hoc reasons for her termination. See E.E.O.C. v. Sears Roebuck & Co., 243 F.3d 846, 852-53 (4th Cir. 2001) (internal citations omitted) ("[T]he fact that Sears has offered different justifications at different times for its failure to hire Santana is, in and of itself, probative pretext.....Moreover, a fact finder could infer from the late appearance of Sear's current justification that it is a post-hoc rationale."). In support of this argument, Plaintiff states that during the integration of QualChoice in 2001-2002, there was no mention in her 2001 and 2002 evaluations that she was not meeting her job expectations. Instead, Plaintiff asserts that she received a substantial raise. Additionally, Plaintiff

states that she was not discharged until September 2003, more than 18 months after the integration was completed.

Lastly, Plaintiff indicates that pretext is shown because Defendants did not follow their own internal procedures in preparing for and executing Plaintiff's termination. See Hamilton v. 1st Source Bank, 896 F.2d 159, 162 (4th Cir. 1990) (finding that the employer's failure to follow its own procedures before discharging the plaintiff constituted substantial evidence to support jury finding of discriminatory discharge). Plaintiff states that under the personnel rules any corrective action taken against an employee must be documented, and that an employee who needs improvement be given an opportunity to address their shortcomings. Plaintiff contends that none of these procedures were taken in her case.

Defendants have proffered a non-discriminatory reason for Plaintiff's termination that is supported by evidence in the record. Specifically, Defendants were aware of managerial concerns with Plaintiff due to the complaints filed by Ms. Walter and Mr. O'Donnell[6] and Plaintiff's performance evaluations. Defendants have clearly identified their reasons for terminating Plaintiff and have shown that the stated reasons were valid at the time of Plaintiff's termination. Just because Defendants did not articulate these reasons at the time of Plaintiff's termination does not mean that they were not the true reason for her termination. Moreover, it is not the job of the Court to decide whether the adverse employment action taken was right or fair. Dugan, 293 F.3d at 722.

Plaintiff has failed to show that Defendants stated reason for terminating her was a pretext for discrimination. The evidence shows that Plaintiff was hired by a male, promoted and given

---

[6]The fact that Plaintiff was cleared of wrongdoing in connection with these complaints, does not mean that Defendants did not consider the complaints when assessing Plaintiff's managerial style.

14

several pay raises by male executives, and was hired to replace a male in one of her positions. Plaintiff's claim is further weakened by the fact that: (1) there are several women in management positions at SHS/CHC; (2) the COO position was created and filled by Plaintiff after it became apparent that she was not qualified to be the CEO of SHS after the QualChoice merger; and (3) two male COOs were terminated when the COO position was eliminated.

Furthermore, the only allegations made by Plaintiff which could suggest gender bias are that she was made to feel unwelcome at golf outings and the statement made by Mr. Davis where he commented that Plaintiff could hold her own in an argument "as well as any man." At best, these incidents, if taken as true, are isolated events of discrimination and are not enough to support her claim of discrimination. See O'Connor v. Consol. Coin Caterers Corp., 56 F.3d 542, 548-49, rev'd on other grounds, 517 U.S. 308 (1996) (4th Cir. 1995) (quoting Gagne v. Northwestern Nat'l Ins. Co., 881 F.2d 309, 314 (6th Cir. 1989) ("[I]solated and ambiguous statements...'are too abstract, in addition to being irrelevant and prejudiced, to support a finding of [gender] discrimination.'"). Lastly, the fact that Defendants may not have followed their internal procedures before terminating Plaintiff is not enough to establish pretext given the facts of this case. Accordingly, summary judgment is appropriate because Plaintiff has only "created only a weak issue of fact as to whether the employer's [proffered] reason [for termination] was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination [] occurred." Reeves, 530 U.S. at 148.

    2. Mixed-Motive Analysis

To establish a claim of mixed-motive gender discrimination, a plaintiff must "present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that [gender]...was a motivating factor for [her termination]." Desert Place, Inc. v. Costa, 539 U.S. 90,

15

95-96, 101 (2003 ); see 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment action"). Under this approach, as opposed to the McDonnell Douglas analysis, the Court must determine whether a plaintiff can meet her ultimate burden of proof to show discriminatory intent, rather than whether the proffered reason was a pretext. Rishel v. Nationwide Mut. Ins. Co., 297 F. Supp.2d 854, 865 (M.D.N.C. 2003).

Plaintiff argues that even if Defendants' proffered reasons for discharge are part of the reason she was terminated, she may still show that sexual discrimination was a motivating factor in her termination. Plaintiff states that she has shown that: (1) her job security deteriorated after she forcefully confronted an underperforming male colleague in front of Mr. Davis; (2) she was told that the elimination of her position was not the true reason for her termination; (3) she had good performance records; and (4) she was given substantial raises while COO. Accordingly, Plaintiff asserts that she has presented sufficient evidence to raise a genuine issue of material fact as to whether Defendants discriminated against her.

Plaintiff has failed to show the direct or circumstantial evidence necessary to establish a mixed motive claim of gender discrimination. As explained above, the circumstances asserted by Plaintiff are not probative of gender discrimination. Moreover, the fact that Plaintiff received favorable evaluations and pay raises does not show that gender discrimination was a motivating factor for her termination. The evidence presented shows that Plaintiff is merely speculating that gender discrimination was the real reason for her termination. Since Plaintiff has failed to met her burden of proof under the McDonnell Douglas analysis, as well as a mixed motive analysis, summary judgment is GRANTED as to Count One.

**B. Count Two**

Plaintiff states that while her First Amended Complaint alleges a breach of contract/*quantum meruit* claim regarding her performance bonus and stock options, these matters are really part of her damages under her sexual discrimination claim. See 42 U.S.C. 2000e-5(g)(1) (permitting back pay); E.E.O.C. v. Nutri/System, Inc., 685 F. Supp. 568, 571 (E.D. Va. 1988) (implying the sufficient evidence of entitlement to bonuses would allow such an award as back pay under Title VII). Based on Plaintiff's concession, summary judgement is GRANTED as to Count Two of Plaintiff's Complaint.

### IV. CONCLUSION

For the reasons outlined above, Defendants' Motion for Summary Judgment is GRANTED. Accordingly, Counts One and Two of Plaintiff's Complaint are DISMISSED.

                                                  /s/ James R. Spencer
                                              UNITED STATES DISTRICT JUDGE

June 2, 2005
DATE